IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

MICHAEL ANTHONY TRIMUAR,
    Petitioner,

vs.                                      Case No.: 3:05cv484/LAC/EMT

JAMES R. McDONOUGH,
    Respondent.
_____/

## REPORT AND RECOMMENDATION

       This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (Doc. 1). Respondent filed an answer and relevant portions of the state court record (Doc. 11). Petitioner filed a traverse (Doc. 16).

       The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.     BACKGROUND AND PROCEDURAL HISTORY

       The procedural background of this case is undisputed by the parties and established by the state court record. Following a bench trial in the Circuit Court for Escambia County, Florida, on January 7, 2003, Petitioner was found guilty of one count of first degree premeditated murder and one count of grand theft (Doc. 11, Ex. A at 83, Ex. B). He was sentenced the same day to life imprisonment, with credit for one year and nineteen days of pre-sentence jail time, on the murder

count and a consecutive term of five years of incarceration on the grand theft count (*id.*, Ex. A at 85–91).

Petitioner appealed his conviction and sentence to the Florida First District Court of Appeal (First DCA). The appellate court affirmed the conviction and sentence per curiam without written opinion on March 25, 2004, with the mandate issuing April 13, 2004 (Doc. 11, Ex. C). <u>Trimuar v. State</u>, 871 So. 2d 216 (Fla. 1st DCA Mar. 25, 2004) (Table).

On November 4, 2004, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Doc. 11, Ex. D at 1–29). The trial court summarily denied the motion on April 11, 2005 (*id.*, Ex. D-1). Petitioner appealed the decision to the First DCA. The appellate court affirmed the decision per curiam without written opinion on September 9, 2005, with the mandate issuing October 6, 2005 (*id.*, Ex. D-4). <u>Trimuar v. State</u>, 911 So.2d 106 (Fla. 1st DCA Sept. 9, 2005) (Table).

Petitioner filed the instant habeas action on December 18, 2005 (Doc. 1 at 17). Respondent concedes that the petition was timely filed (Doc. 11 at 3).

II. STANDARD OF REVIEW

Section 2254(a) of Title 28 provides, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws of the United States." As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for federal habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19.

Section 2254 now provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
   (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (West Supp. 2001).

The United States Supreme Court explained the framework of review under § 2254(d)(1) in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[1] The appropriate test in habeas cases was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13; Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). More recently, in Lockyer v. Andrade, 538 U.S. 63, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003), the Supreme Court instructed that, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal state court proceeding, the federal court should first ascertain the "clearly established Federal law," namely: "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Id.*, 538 U.S. at 71–72. The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998).

The Eleventh Circuit has developed a three-step process for applying the Williams test to any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in

---

[1] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99, 120 S. Ct. at 1499–1503, 1511–16); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13, 120 S. Ct. at 1518–23). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

a formal state court proceeding. *See* Wellington v. Moore, 314 F.3d 1256, 1260–61 (11th Cir. 2002); Robinson v. Moore, 300 F.3d 1320, 1343–45 (11th Cir. 2002). First, the court must ascertain the controlling legal principles that are clearly established by the Supreme Court at the time of the state court adjudication. Wellington, 314 F.3d at 1260; Robinson, 300 F.3d at 1343. Second, the court must determine whether the state court adjudication was contrary to the clearly established Supreme Court law. Wellington, 314 F.3d at 1260, Robinson, 300 F.3d at 1344. "The 'contrary to' clause in § 2254(d)(1) 'suggests that the state court's decision must be substantially different' from the relevant Supreme Court precedent." Wellington, 314 F.3d at 1260 (quoting Fugate v. Head, 261 F.3d 1206, 1216 (11th Cir. 2001), *cert. denied*, 535 U.S. 1104, 122 S. Ct. 2310, 152 L. Ed. 2d 1065 (2002) (quoting Williams, 529 U.S. at 405)). "Although a state court's decision that 'applies a rule that contradicts' the governing Supreme Court law is 'contrary,' a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law." Wellington, 314 F.3d at 1260 (citing and quoting Williams, 529 U.S. at 404–06). If the state court applied the correct Supreme Court precedent, and the United States Supreme Court, faced with materially indistinguishable facts, has not reached a decision different from the decision reached by the state court in the petitioner's case, the case does not fit within the "contrary to" clause, and the federal habeas court must proceed to the third step and determine whether the state court "unreasonably applied the relevant Supreme Court authority." Fugate, 261 F.3d at 1216. Likewise, if the facts of the Supreme Court cases and the petitioner's case are not substantially similar, "a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law." *Id.* (citing and quoting Williams, 529 U.S. at 406). A state court is not required to cite Supreme Court cases or even be aware of the cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).

The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 410. The Supreme Court has explained that "a federal habeas court may not issue a writ under the

unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Bell v. Cone, 535 U.S. 685, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002) (quoting Williams, 529 U.S. at 411). Indeed, "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Lockyer, 538 U.S. 63. A state court's incorrect application of clearly established law will be held to be reasonable and not warrant a writ unless "thorough analysis by a federal court produces a firm conviction that [the state court] judgment is infected by constitutional error." Williams, 529 U.S. at 389. "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." Yarborough v. Alvarado, 541 U.S. 652, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004) (citation omitted). Although § 2254(d)(1) is concerned only with federal law as clearly established by the Supreme Court, this court may look to circuit precedent to demonstrate reasonable applications of Supreme Court precedent. Van Poyck v. Fla. Dep't of Corrections, 290 F.3d 1318, 1322 n.4 (11th Cir. 2002).

In deciding whether a state court decision involved "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding" under § 2254(d)(2), determinations of fact are "presumed to be correct," unless the presumption is rebutted by Petitioner "by clear and convincing evidence." § 2254(e)(1); *see* Miller-El v. Cockrell, 537 U.S. 322, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).") (dictum); Fugate, 261 F.3d at 1215 (quoting 28 U.S.C. § 2254(e)(1)); Parker v. Head, 244 F.3d 831, 835–36 (11th Cir. 2001) (citing § 2254(d)(2) and (e)(1)); *see also* Crawford v. Head, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides a "highly deferential standard of review" of the state court's factual determinations). Thus, not only must the state court's factual determination have been unreasonable, but the court's factual findings must be shown unreasonable by clear and convincing evidence. *See* Callahan v. Campbell, 427 F.3d

897, 926 (11th Cir. 2005) (citing § 2254(e)(1); Rutherford v. Crosby, 385 F.3d 1300, 1308 (11th Cir. 2004) ("[Petitioner] has not shown by clear and convincing evidence that the Florida Supreme Court's factual finding . . . [wa]s unreasonable in light of the evidence in the state court record.")); *see also* Jones v. Walker, --- F.3d at ---, No. 04-13562, 2007 WL 2376275, at *10–11 (11th Cir. Aug. 22, 2007) (holding that the AEDPA's "unreasonable determination" standard must be met by clear and convincing evidence and concluding that § 2254(d)(2) was satisfied where prisoner showed "clearly and convincingly" that state court's decision "contain[ed] an 'unreasonable determination' of fact"). If a petitioner satisfies the AEDPA, and § 2254(d)(2), the federal court must review the merits of the constitutional claim "without deferring to the state court's finding. . . ." Panetti v. Quarterman, --- U.S. --- 127 S. Ct. 2842, 2858, --- L. Ed. 2d --- (2007).

Only if the federal habeas court finds the state court decision to be contrary to, or an unreasonable application of, clearly established Supreme Court law does it take the final step of conducting an independent review of the merits of the petitioner's claims. Panetti, 127 S. Ct. at 2858 (holding that "[w]hen a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement of § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires."); Jones, 2007 WL 2376275, at *13. Even so, the writ still will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

III.  PETITIONER'S CLAIMS

  Ground one:  "Ineffective assistance of counsel when he failed to object to the admission of blood evidence due to irrelevancy"

(Doc. 1 at 4, 6–10). Petitioner claims that his counsel should have objected to the admission of certain blood evidence at trial on the ground that it was irrelevant to the State's theory of how Petitioner committed the crime, and the evidence confused the judge, who was sitting as the trier of fact (*id*. at 6). Petitioner states that a crime scene investigator testified that the following evidence was discovered in the victim's home: a broken fingernail, and spots of blood on a glass coffee table, couch, furnace grate and surrounding floor area, and fireplace (*id*. at 7). Petitioner states that

investigators used "Luminol" testing to discover blood near the furnace grate and a limited area of the floor, as well as a thin blood trail in the victim's bedroom (*id*.). Additionally, "light source tests" revealed an invisible puddle of "cleaned up" blood residue under a rug in the livingroom (*id*. at 7–8). Petitioner contends that although the blood spatter evidence was admissible, the blood discovered by "Luminol" and "light source testing" was not admissible because there was no basis for a reasonable inference that it was the victim's blood since that blood was not tested for DNA (*id*. at 9). Furthermore, the State's sole theory of prosecution was that he initially intended to kill the victim by stabbing her, but he resorted to strangulation when he could not penetrate the victim's clothing with a knife (*id*. at 8). Petitioner argues that in light of this theory, the admission of blood evidence would tend to refute the State's theory that the cause of death was strangulation because there is little external bleeding in such circumstances (*id*.). Petitioner asserts he was prejudiced by counsel's failure to object to admission of the evidence because the judge based his finding of premeditation solely on the blood evidence (*id*. at 9–10).

Respondent concedes that Petitioner exhausted this claim by raising it on direct appeal of his conviction (Doc. 11 at 3), but argues Petitioner is not entitled to federal relief because he has failed to satisfy the § 2254 standard (*id.* at 13–16).

    1.  Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To obtain relief under Strickland, a petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. 466 U.S. at 687–88. It is the petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable and that he suffered prejudice as a result thereof. *Id.* at 687. If a petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

> In determining whether counsel's performance was reasonable, the Court instructed:
>
> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel

> was unreasonable.  *Cf*. Engle v. Isaac, 456 U.S. 107, 133–134, 102 S. Ct. 1558, 1574-1575, 71 L. Ed. 2d 783 (1982).  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  *See* Michel v. Louisiana, *supra*, 350 U.S. at 101, 76 S. Ct. at 164.

Strickland, 466 U.S. at 689.

As to the prejudice prong of the Strickland, the Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'"  Strickland, 466 U.S. at 693.  However, the Court has also clarified that a petitioner need not demonstrate it 'more likely than not, or prove by a preponderance of evidence,' that counsel's errors affected the outcome.  Strickland, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.  Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  Williams v. Taylor, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law.  Strickland, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.  Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than

one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.

*Id.* at 695–96.

    2.  Federal Review of State Court Decision

Petitioner raised this claim as Ground One in his Rule 3.850 motion (*see* Doc. 11, Ex. D at 10–19). Petitioner attached an appendix to his motion, which apparently included reports from the Florida Department of Law Enforcement (FDLE) (*see id.* at 3, 10–12, 30).[2] Petitioner asserted in his Rule 3.850 motion that an FDLE report dated January 28, 2002, stated that DNA testing was conducted on several blood samples from the crime scene and hair samples from the victim, and the report concluded that some of the blood recovered from a couch cushion and the furnace grate matched the victim's DNA, but no DNA testing was conducted on other blood samples from the furnace grate (*id.* at 11–12).

In the written opinion denying Petitioner's claim, the post-conviction court found as fact that Petitioner did not allege that the blood was not that of the victim; he merely alleged that the blood was not tested to determine whether it was the victim's (*id.*, Ex. D-1 at 32). Furthermore, the state court found that Petitioner admitted that DNA testing was conducted on some of the blood, and the blood was positively identified as the victim's (*id.*). The state court concluded that Petitioner failed to show that he was prejudiced by counsel's failure to object to admission of the few samples that were not tested (*id.*).

The trial transcript shows that the medical examiner who examined the victim's body testified that he could not make a determination of the cause of death because the surfaces of the victim's body, her internal organs, and much of her skeletal system had been destroyed by burning (Doc. 11, Ex. B at 196–97).

Ted Hughes, who was charged with accessory after the fact to capital murder and tampering with evidence in relation to the murder, testified that on December 10, 2001, Petitioner told him he

---

  [2]The appendix was not included in the record submitted to this court.

killed his landlady (Doc. 11, Ex. B at 68). Petitioner told Mr. Hughes that he went downstairs to his landlady's apartment at 9:00 that morning and strangled her with the black gloves (*id*.). Petitioner disclosed to Mr. Hughes that he tried to stab the victim but it did not work, so he strangled her (*id*. at 79). Petitioner also told him that there was a little bit of blood, but he could clean it up (*id*. at 80).

Petitioner testified that at approximately 9:45 a.m. on December 10, 2001, he went to the victim's apartment to beg her not to evict him (*id*. at 205, 207, 210). When he turned to leave, the victim pushed him twice, so he struck her (*id*. at 210–11). Petitioner testified that the victim stumbled into a filing cabinet and then stumbled in the other direction (*id.* at 227). Petitioner left the victims' apartment but returned 30–45 minutes later to make sure she was all right (*id*. at 211–13). The victim did not answer Petitioner's knock, so he entered her apartment and saw her lying on the floor next to the couch and a furnace grate (*id*. at 213). He saw a little bit of blood coming from her nose and mouth (*id*. at 214). In a statement to police, Petitioner admitted that prior to his contact with the victim that morning, he had been drinking, smoking marijuana, and snorting cocaine (*id*. at 167–68). He also admitted that when he hit her, he hit her in the nose as hard as he could, her nose was bleeding, and she stumbled to the floor (*id*. at 169).

Lee Jennings, a crime scene investigator, testified that when he went to the victim's home, he found possible blood spatter on the couch and a glass coffee table in the livingroom, on the floor and the fireplace hearth in the livingroom, on the grate of a floor furnace in the doorway between the livingroom and a bedroom, and on the floor around the furnace (Doc. 11, Ex. B at 33, 35–36, 40–42, 46). Investigator Jennings testified that he tested the possible blood with a chemical called phenolphthalein and reached positive results which indicated that the substance was indeed blood (*id*. at 42). Jennings further testified that he conducted another test with the chemical Luminol on part of the floor extending from the furnace grate to the entrance of the bedroom (*id*.). Jennings testified that Luminol reacts with blood and causes a fluorescent glow in the dark when blood is present, even if there has been an attempt to clean up the blood and the blood is not detectable with the human eye (*id*. at 42–43). He testified that the Luminol revealed a thin trail of blood between the floor grate and the entrance to the bedroom (*id*. at 43).

Nicole Heintzelman, another crime scene analyst, testified that she performed the phenolphthalein test on the spots on the coffee table and determined that it was blood (*id*. at 53–54).

She also confirmed that there was blood spatter on the hearth (*id*. at 58–59). Investigator Heintzelman testified that she also assisted Investigator Jennings in processing the scene with Luminol (*id*. at 54). She stated that the Luminol testing showed a trail of blood running the length of the bedroom and around the furnace grate on the floor of the livingroom (*id*. at 54–57). She testified that she could not say whether someone had attempted to clean up the blood (*id*. at 56). Investigator Heintzelman further testified that she could see some blood under an oriental rug in the livingroom, but the blood became more visible with Luminol testing and "alternate light source examination" (*id*. at 57–58, 61).

The state court's findings of fact with regard to Petitioner's allegations in his Rule 3.850 motion are supported by the record. In his motion, Petitioner did not allege that the blood recovered from the victim's apartment was not the victim's; he merely alleged that some of the blood was not tested to determine whether it was hers (Doc. 11, Ex. D at 10–16). Furthermore, Petitioner admitted in his motion that DNA testing was conducted on some of the blood, and the blood was positively identified as the victim's (*id*. at 12). He contended that the blood trail from the furnace grate through the bedroom was not tested, nor was the blood on the floor under the rug (*id*. at 13). Likewise, in the instant habeas petition, Petitioner concedes that DNA testing was performed on blood spatter found "in the open," and the testing showed that it was the victim's (Doc. 1 at 8). He asserts that DNA testing was not done on the area of the floor under the oriental rug (*id*. at 8–9).

Petitioner failed to establish a reasonable probability that the result of his trial would have been different if counsel had objected to the admission of evidence of the blood trail and the blood under the rug. Although Petitioner is correct that the trial court relied on the blood evidence as evidence of premeditation, the record reveals that the allegedly objectionable blood evidence, specifically, the blood trail the blood under the livingroom rug, was a small part of a large body of evidence that supported the court's finding of premeditation. The trial judge stated that the evidence convinced him beyond any doubt that Petitioner stabbed and choked the victim (*see* Doc. 11, Ex. B at 275). The judge stated that his finding of premeditation was based upon many factors, including the following: (1) one or two weeks prior to the murder, Petitioner asked Mr. Hughes how long he could make someone disappear before people would come looking for that person; (2) Petitioner went to the victim's apartment at least once or twice prior to the killing and exchanged

heated words with her; (3) Petitioner's story that he hit the victim in the nose without intending to kill her was suspect because it was unrealistic that all of the blood found in the apartment was caused by a nosebleed; (4) Petitioner told Mr. Hughes that he had a knife in his possession that he used to try to kill the victim and when that was not effective, he undertook to strangle her; and (5) Petitioner was in dire need of money and learned the victim's personal identification number (PIN) and used it to access her bank account at an automated teller machine (ATM) (*id.* at 275–83). In light of the fact that the blood that was not tested for the victim's DNA was only part of the blood evidence relied upon by the judge, and there is no dispute that the remaining blood evidence was the victim's, as well as the fact that the blood evidence was only one of many factors supporting the judge's finding of premeditation, Petitioner has failed to show a reasonable probability that the result of his trial would have been different if the evidence of the thin blood trail and blood under the rug had not been admitted into evidence. Therefore, the state court decision concluding that Petitioner failed to demonstrate <u>Strickland</u> prejudice was not contrary to or an unreasonable application of <u>Strickland</u>. Accordingly, Petitioner is not entitled to habeas relief on this claim.

   B. <u>Ground two: "Ineffective assistance of counsel for failing to timely file a pre-trial motion to suppress on statements given that were due to threats"</u>

(Doc. 1 at 4, 11–16). Petitioner next claims that his counsel should have filed a pre-trial motion to suppress Petitioner's statements to detectives on the ground that the detectives obtained the statements through the use of threats and promises (*id.* at 11). Petitioner asserts that when he spoke to Detectives Harnett and Chamberlain on December 20, 2001, he informed them that he had been using alcohol, cocaine, and marijuana, but the detectives continued to interrogate him (*id.*). Petitioner asserts that Detective Chamberlain threatened him by stating, "Don't tell a lie. Do not try and piss us off because if you do you know what's gonna happen, right?" (*id.*). According to Petitioner, Detective Chamberlain then made the following promise, "I'm sorry, and you're gonna find out when this thing comes to an end . . . because we're gonna be on your side. . . . Alright . . . If we say we're gonna do that we mean we do mean [sic] it" (*id.* at 11–12). Petitioner states that the alleged threat and promise so confused "an admittedly intoxicated defendant" that he waived his right to remain silent, thus rendering his confession involuntary (*id.* at 12–13). Petitioner concedes that his counsel sought to exclude his statements at trial, but Petitioner argues that counsel's waiting

until trial to seek their exclusion prejudiced him because he was not afforded an evidentiary hearing on the suppression issue, which he would have received if counsel had file a pre-trial motion to suppress (*id*. at 13–16).

Respondent concedes that Petitioner raised this claim in his Rule 3.850 motion, with the exception of his argument regarding the timing of defense counsel's motion to exclude the statements (Doc. 11 at 3). Respondent claims that in the Rule 3.850 motion, Petitioner argued that his counsel failed to object to admission of the statements either at trial or by pre-trial motion, but he now asserts that the only effective means of seeking exclusion of the statements was through a pre-trial motion (*id*. at 3–4). Respondent contends that Petitioner did not specifically present the timing issue to the state court (*id*. at 4). Regardless, Respondent contends Petitioner is not entitled to federal relief because he has failed to satisfy the § 2254 standard (*id*. at 16–22).

    1.  Clearly Established Supreme Court Law

The clearly established law governing claims of ineffective assistance of counsel is set forth *supra*.

    2.  Federal Review of State Court Decision

Petitioner raised this claim as Ground Two in his Rule 3.850 motion (*see* Doc. 11, Ex. D at 20–28). He argued that counsel performed ineffectively by failing to file a motion to suppress and failed to contemporaneously object to admission of the statements at trial (*id*. at 20).

In the written opinion denying Petitioner's claim, the post-conviction court concluded that Petitioner's statements to police investigators were not the result of police misconduct (Doc. 11, Ex. D-1 at 32). The court reached this conclusion after reviewing the investigator's statements identified by Petitioner in his post-conviction motion, as well as the transcripts of Petitioner's interrogations by police included in the record (*id*.). After reviewing the record, the state court found that Detective Chamberlain's threatening language was in response to his catching Petitioner in a lie, and Chamberlain then apologized for losing his temper (*id*.). Furthermore, Detective Chamberlain's alleged promise that he and Detective Harnett would help Petitioner as best they could did not constitute a quid pro quo promise (*id*.).

This court must presume the state court's subsidiary and historical findings of fact to be correct unless Petitioner rebuts the presumption of correctness with clear and convincing evidence.

Case No: 3:05cv484/LAC/EMT

28 U.S.C. § 2254(e)(1). *See* Waldrop v. Jones, 77 F.3d 1308, 1316 (11th Cir. 1996); McCoy v. Newsome, 953 F.2d 1252, 1263 (11th Cir. 1992) (stating that subsidiary findings, such as the circumstances of the defendant's interrogation and the actions of law enforcement officers are entitled to a presumption of correctness); Harris v. Dugger, 874 F.2d 756, 762 (11th Cir. 1989) (subsidiary factual questions, such as whether in fact the police engaged in the intimidation tactics alleged by the defendant, are entitled to the § 2254 presumption of correctness) (citing Miller v. Fenton, 474 U.S. 104, 112, 106 S.Ct. 445, 88 L. Ed. 2d 405 (1985)).

Initially, the portion of the record cited by Petitioner in support of his assertion that he was intoxicated at the time of the interrogation does not support this assertion at all (*see* Doc. 1 at 11, citing pages 168 and 243 of the trial transcript). Those portions of the record show that Petitioner told the detectives he was under the influence of alcohol, marijuana, and cocaine on the day of the murder, not on the day of the interrogation ten days later (*see* Doc. 11, Ex. B at 168, 243). Additionally, Petitioner has failed to offer clear and convincing evidence that rebuts the state court's factual findings that Detective Chamberlain did not promise Petitioner anything in exchange for his confession, and although Detective Chamberlain used threatening language in response to Petitioner's lying to him, he immediately apologized for losing his temper. Furthermore, the record supports these findings. Detective Harnett testified that he asked Petitioner to come to the police station to be interviewed on December 20, 2001 (Doc. 11, Ex. B at 108). Petitioner arrived at the police station around 10:00 a.m., and Detective Chamberlain advised him of his Miranda rights (*id*. at 137–43). Petitioner initially denied knowledge of the victim's disappearance, but when the detectives showed him surveillance tapes of him using the victim's ATM card, he admitted that he was the person in the tape and stated that two men forced him to use the card (*id*. at 108–10). He also stated that the victim was killed by the two men, and he knew where her body was located (*id*. at 110). Petitioner agreed to lead the detectives to the body, so Detectives Harnett and Chamberlain handcuffed Plaintiff, placed him in a patrol car at noon or 1:00 p.m., and drove to the location (*id*. at 111, 138). On the way to the site, the detectives conversed with Petitioner and recorded the conversation (*id*. at 111). The statements of Detective Chamberlain that Petitioner characterizes as threats and promises were made during that conversation, and the recording of the conversation was played at trial:

    MR. CHAMBERLAIN: (Unintelligible) you be truthful.

    THE DEFENDANT: Yes, sir.

    MR. CHAMBERLAIN: Don't tell a lie. Don't let us try and catch you in a lie. Do not try and piss us off because if you do, you know what's going to happen, right?

    THE DEFENDANT: Yes, sir.

    MR. CHAMBERLAIN: Okay. Let's just keep on an even keel like that, okay? And I apologize that I yelled at you.

    THE DEFENDANT: It's part of –

    MR. CHAMBERLAIN: All right?

    THE DEFENDANT: -- your job, sir.

    MR. CHAMBERLAIN: I'm sorry. And you're going to find out when this thing comes down to an end, you're going to find out that you actually probably are going to like me in the end because we're going to be on your side.

    THE DEFENDANT: I don't have a problem with y'all. Y'all are just doing your job.

    MR. CHAMBERLAIN: All right, we're going to help you the best we can. And we, if we say we're going to do that we mean, we do mean it, we're not bullshitting.

    MR. HARNETT: Mike.

    MR. CHAMBERLAIN: We don't do that.

    THE DEFENDANT: (Unintelligible).

    MR. HARNETT: I mean, I mean, really, I mean, this last week, has it been tough? This is –

    THE DEFENDANT: I want –

    MR. HARNETT: -- stuff I need to know but –

THE DEFENDANT: I wanted to say something earlier but I, I wanted to come to you as soon as possible, but I was just scared that they [the two males] were going to really kill me.

MR. CHAMBERLAIN: Well, we got you now and there ain't nobody going to hurt you.

THE DEFENDANT: I don't want to go to jail. I just, I even thought about killing myself but I can't do that. I couldn't.

MR. CHAMBERLAIN: No, because you're going to make it through this. You're going to make it through this. You're going to come out okay. You're going to be fine.

THE DEFENDANT: I'm scared.

MR. CHAMBERLAIN: Don't be scared.

THE DEFENDANT: I'll do anything, though. Anything y'all want me to do, I'll do it.

MR. CHAMBERLAIN: All we want you to do is to be truthful with us, that's all we want you to do. You know, like I said, the main thing is, you know, don't, don't let us try and catch you in another lie because then it, everything gets shot in the ass, you know, and, and its [sic] hard for us to try and tell the State Attorney, yeah, this is okay but then he lied about this but this is okay. (Unintelligible).

MR. HARNETT: Just like I said, Mike, its [sic] either the whole truth or a whole lie. You can't have a little bit of each. It's either all or nothing.

THE DEFENDANT: (Unintelligible).

MR. HARNETT: It is either all or nothing.

THE DEFENDANT: I was just trying to protect myself.

MR. HARNETT: Well, you know, that's, that's natural Mike, you know, that's natural for one, you know, the self-preservation thing, it's natural. But there comes a time when, when your best interests lie in telling the truth.

      THE DEFENDANT:  Yeah, but I don't know who those people know.  I mean they know where I live, they know my girlfriend, they know, they know where my mom lives, I mean –

      MR. CHAMBERLAIN:  We're going to take care of everybody.

      THE DEFENDANT:  I mean all they have to do is after they get locked up, maybe a year down the road or whatever, I mean all they have to do is make a phone call and tell them, hey, y'all need to get this kid and that's it.  Y'all find me somewhere.

      MR. CHAMBERLAIN:  You know, I want to explain something to you, Mike.  As many years as I've been doing this, then think of as many years as Danny's been doing this, people worry about that, about them coming back and retaliating against them.  Do you know and this is not bullshit, do you know that I've never had one case, not one single murder case that I've worked where anybody that was involved had come back to try and get a witness or come back and get somebody's family.

. . . .

      MR. HARNETT:  . . . but you're doing the right thing now.  Just keep doing it.

      MR. CHAMBERLAIN: Michael, when you're talking Midway, is that, that's the road, it's 98, it's out of, going out of Gulf Breeze, right?

      THE DEFENDANT:  You go, you want to go through Gulf Breeze proper and out towards The Friary but it's before The Friary.

. . . .

      MR. HARNETT:  Did she [the victim], where is she in regards to the church?  I mean is she behind it or what?

      THE DEFENDANT:  She's down the road and it was, I know, like when they took me back there, they knew exactly what to do.  I mean he's, it's like they knew what they had already planned it or I don't know.  It was just like they took me out there.  Minuk [one of the alleged males] had the body, I guess in some sheets or bag or something and he drug it and Brett [the other alleged male] kept the gun on me the whole time and made me walk in front of him.

(Doc. 11, Ex. B at 112–17).  Petitioner continued his story about two males forcing him at gunpoint to accompany them to dispose of the victim's body, a story he later recanted.  Petitioner also told the detectives that he never touched the victim's van but later admitted that he drove it.  When the detectives and Petitioner arrived at the site where Petitioner disposed of the victim's body, Petitioner

led the detectives through the woods and to the body (*id*. at 135). At that point, according to Detective Harnett, Petitioner fell to his knees and said he was responsible (*id*. at 135–36). The detectives took Petitioner back to the police station, re-advised Petitioner of his Miranda rights, and interrogated him (*id*. at 136–37, 144–57). During that interrogation, which lasted from 4:17 p.m. to 4:31 p.m., Petitioner changed his story somewhat, but still insisted that two males forced him to dispose of the body (*id*.). At 5:15 p.m., the detectives conducted a third interrogation (*id*. at 157–65). During that interrogation, Petitioner insisted he did not commit the murder (*id*.). At 6:47 p.m., the detectives conducted a fourth and final interrogation, during which Petitioner admitted he struck the victim as hard as he could in her nose, her nose was bleeding, and she stumbled to the floor (*id*. at 167–69). He also admitted that he used her ATM card, put her body in the back of her van, he and Ted Hughes drove her to the woods, and he burned her body (*id*. at 169–73). Petitioner testified at trial that during the third interrogation, he knew that the officers did not believe what he was saying, and he finally decided to tell the truth because he felt horrible about the murder (*id*. at 232). At trial, Petitioner's counsel objected to admission of Petitioner's statements to Detectives Harnett and Chamberlain on the ground that even though the detectives advised Petitioner of his Miranda rights when he voluntarily came to the police station that morning, they did not re-advise him of his rights when they took him into custody by handcuffing him when they drove to the site of the body two or three hours later (*id*. at 137–43). Defense counsel renewed his motion to suppress with regard to the interrogations that occurred after the three returned to the police station (*id*. at 157, 166). The court overruled the objections (*id*. at 143, 157, 166).

In light of the findings that Detective Chamberlain did not promise Petitioner anything in exchange for his confession, and although Detective Chamberlain used threatening language in response to Petitioner's lying to him, he immediately apologized for losing his temper, Petitioner failed to show that defense counsel had a meritorious basis for seeking suppression of his confession on the ground that it was coerced. Most of the cases in which courts have found that a statement was given involuntarily involve affirmative coercion, even physical abuse, on the part of the interrogator. *See, e.g.*, Mincey v. Arizona, 437 U.S. 385, 401, 98 S. Ct. 2408, 2418, 57 L. Ed. 2d 290 (1978); Townsend v. Sain, 372 U.S. 293, 83 S. Ct. 745, 761–62, 9 L. Ed. 2d 770 (1963), *overruled on other grounds*, Keeney v. Tamayo-Reyes, 504 U.S. 1, 112 S. Ct. 1715, 118 L. Ed. 2d 318 (1992)

(questioning the voluntariness of a defendant's confession where the police had injected him with a powerful narcotic having the properties of a "truth serum" moments before his confession); Brown v. Mississippi, 297 U.S. 278, 287, 56 S. Ct. 461, 465–66, 80 L. Ed. 682 (1936) (questioning the voluntariness of a defendant's confession where the police officer interrogating him repeatedly whipped him and threatened to continue whipping him until he confessed). *Cf.* Grayson v. Thompson, 257 F.3d 1194, 1230 (11th Cir. 2001) (finding statements were given voluntarily despite the defendant's intoxication); Miller v. Dugger, 838 F.2d 1530, 1538 (11th Cir.1988) (finding defendant's statements to be voluntary even though defendant was clinically insane when he gave them).

In the instant case, Petitioner did not confess during the conversation in which the alleged threat and promise were made, that is, the first recorded conversation during the ride to the site of the body. During that conversation, as well as the two interrogations that followed at the police station, Petitioner insisted that two other men committed the murder and forced him to help dispose of the body. Petitioner did not confess he committed the murder until the final interrogation that occurred nearly six hours after the conversation that contained the alleged threat and promise (and at least six hours after his last ingestion of intoxicating substances, assuming that such ingestion occurred). Moreover, Petitioner's responses to the detectives during all of the interrogations, including the first one in which the alleged threat and promise were made, give no indication that he felt threatened by the detectives, that he was under the impression that they promised him something in exchange for his confession, or that he was intoxicated. By Petitioner's own admission, his confession was the result of his realization that the detectives did not believe his story about the two other men, and the fact that he felt horrible about killing the victim. Petitioner has failed to show that his counsel had a meritorious basis for seeking suppression of his confession on the ground that it was induced by threats or promises by the detectives. Furthermore, he has failed to establish a reasonable probability that a motion to suppress on these grounds would have been granted. Therefore, the state court decision denying his ineffective assistance of counsel claim was not contrary to or an unreasonable application of Strickland. Accordingly, he is not entitled to federal habeas relief.

For the aforementioned reasons, it is respectfully **RECOMMENDED**:

That the petition for writ of habeas corpus (Doc. 1) be **DENIED**.

At Pensacola, Florida, this 4th day of October 2007.

        /s/ *Elizabeth M. Timothy*
        **ELIZABETH M. TIMOTHY**
        **UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of objections shall be served upon the magistrate judge and all other parties. Failure to object may limit the scope of appellate review of factual findings.** *See* **28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**